IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN BALMAT, et al.                    :        CIVIL ACTION
                                        :
        v.                              :
                                        :        NO.  04-2505
CERTAINTEED CORPORATION                 :
                                        :                    FILED DEC 2 8 2007

## MEMORANDUM AND ORDER

Kauffman, J.

December 28, 2007

Plaintiffs John Ducaji, Douglas Ford, Michael Mann, Richard Parker, John Ward, and Kenneth Wilson (collectively "Plaintiffs") bring this action against Defendant CertainTeed Corporation ("Defendant" or "CertainTeed"), alleging breach of contract and violations of the Employee Retirement Income Security Act of 1974 (ERISA).  Now before the Court are Defendant's Motions for Summary Judgment (the "Motions").[1]  For the reasons stated below, the Motions will be granted.[2]

## I.    Background

Plaintiffs, former sales representatives of Defendant CertainTeed, were terminated as a result of expense report audits conducted by Saint Gobain Corporation ("Saint Gobain"), Defendant's parent company.  Defendant argues that each Plaintiff was terminated for cause after an investigation revealed multiple irregularities and inaccuracies in his expense reporting, in violation of CertainTeed's Travel and Entertainment Expense Policy ("T&E Policy") and Code

---

[1]     Defendant has filed a separate Motion for each Plaintiff.

[2]     On November 16, 2007, the Court held a hearing on the Motions for Summary Judgment.

1



of Ethics.  Plaintiffs argue that the Defendant's stated reason for the terminations was pretextual, and that they were motivated by the company's desire to avoid paying Plaintiffs' bonuses and other benefits, coupled with a plan to downsize the business and cut costs.

The audits that led to Plaintiffs' terminations were conducted by Robert Wilk, Saint Gobain's Director of Corporate Security, and Joseph Johnson, an independent contractor retained by Saint Gobain as part of an ongoing process that monitored compliance with company expense reporting policies.  See Deposition of Robert Wilk ("Wilk Dep.") at 13-15, 29-32, 52-55.[3]  The audit process began after Saint Gobain informed Wilk which businesses should be audited.  Id. at 85-86.  Johnson thereafter performed a "quick scan" of all the division employees' files in order to identify any patterns of irregularities or inaccuracies known as "red flags" that would require further inquiry.  Id. at 85-88; Deposition of Joseph Johnson ("Johnson Dep.") at 22-28.  After the quick scan, Johnson obtained further documentation for employees whose "red flags" he could not explain.  He then conducted a more detailed investigation of the expense reports.  In some cases, Johnson found legitimate explanations for the red flags.  With respect to individuals whose red flags remained unexplained, Johnson created a database that contained the relevant patterns of irregularities.  See id. at 23-28.

Johnson reported his findings to Wilk, and the two then met with management representatives to brief them on the status of their audit.  See Wilk Dep. at 119-22.  During these meetings, Wilk solicited management input, including any legitimate explanations for remaining red flags.  Id. at 123-24.  Those employees whose red flags could not be explained were sent

---

[3]     Plaintiffs Ducaji, Ford, Ward, Wilson, and Parker were members of CertainTeed's Insulation Group, while Plaintiff Mann was a member of the Roofing Products Group.  Employees of both groups were audited by Wilk and Johnson.

letters inviting them to an interview.  Id. at 67, 88-91, 122, 124; Johnson Dep. at 243-45.  The letters informed the employees that "as part of Saint Gobain's periodic examination of Travel & Entertainment expenses and activities" they are requested to attend an interview.  See Ducaji Exhibit 24.  The letters further encouraged the employees to come prepared with supporting documentation that would help explain any irregularities.  Id.

Interviews of members of CertainTeed's Insulation Group were held at a hotel over a period of two weeks, beginning October 27, 2003.  Wilk and Johnson, who conducted the interviews, testified that they began by informing the employee of the reason for the interview and explaining the review process.  See Wilk Dep. at 78-80.  The employee was then shown a list of the red flags and asked to explain them.  Id. at 87-89.  In some cases, the interviews were lengthy, lasting several hours, while in other cases, they were cut short by the employee.  Id. at 90-91.  Those employees who provided legitimate explanations for the majority of the red flags were retained.  However, employees who were either unable or unwilling to provide satisfactory explanations were asked to meet with a manager from the relevant business unit.  Id. at 93-98.

Jorma Toivonen, President of the Insulation Group, handled post-interview meetings for the Insulation Group, and had final decision-making authority with respect to termination.  See Deposition of Jorma Toivonen ("Toivonen Dep.") at 24-26.  After discussion with Wilk and Johnson, Toivonen met with each interviewed employee.  Wilk and Johnson typically attended, provided an overview of the interview and asked the employee to confirm the accuracy of the report.  See Wilk Dep. at 98.  Toivonen then discussed the red flags with the employee and rendered a final employment decision.  If the employee was terminated, Ruth Chambers of the human resources department updated the employee on his or her benefits eligibility.  See

Deposition of Ruth Chambers ("Chambers Dep.") at 7-8, 114.  Of the fourteen employees who were interviewed as a result of the Insulation Group audit, ten were terminated or asked to resign.  See Chambers Dep. Ex. 2.

With respect to the Roofing Products Group, final decision-making authority rested with William Burke, Vice President of Finance and Controller.  See Deposition of William Burke ("Burke Dep."), at 7-8, 35-36.  After Wilk and Johnson reported on an interview, Burke met individually with the employee, reviewed the red flags, and rendered a final employment decision.  See id. at 22-24.  Those employees who were terminated were briefed by Marie Carreras of the human resources department on their benefits status.  Id. at 40-41.  Of the twenty-one employees interviewed as a result of the Roofing Products Group audit, eleven were retained.  See Affidavit of Marie Carreras ("Carreras Aff."), Ex. A.

## II.    Legal Standard

In deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."  Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine the evidence in the light most favorable to the non-moving party and resolve all reasonable inferences in that party's favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "there can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete

4

failure of proof concerning an essential element of [its] case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

The party moving for summary judgment bears the initial burden of showing the basis for its motion. <u>See Shields v. Zuccarini</u>, 254 F.3d 476, 481 (3d Cir. 2001). If the movant meets that burden, the onus then "shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial." <u>Id.</u>

## III.   DISCUSSION

### A.   ERISA Claim

Section 510 of ERISA makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary of an employee benefit plan for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140; <u>Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.</u>, 520 U.S. 510, 511-12 (1997); <u>Lafata v. Raytheon Co.</u>, 147 Fed. Appx. 258, 263 (3d Cir. 2005). In order to "recover under section 510, the employee must show that the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits. Mere proof of an incidental loss of benefits resulting from an employee's discharge from employment does *not* constitute a violation of Section 510." <u>Szczesny v. Gen. Elec. Co.</u>, 66 Fed. Appx. 388, 394 (3d Cir. 2003); <u>Makenta v. Univ. of Pa.</u>, 88 Fed. Appx. 501, 504 (3d Cir. 2004) ("[T]o recover, a plaintiff must demonstrate that the defendant had the 'specific intent' to violate § 510."). Both direct and circumstantial evidence may be used to establish specific intent, but when no direct evidence is offered, the Court must apply the *McDonnell Douglas-Burdine* burden-shifting analysis. <u>See Jakimas v. Hoffmann-La Roche, Inc.</u>,

485 F.3d 770, 785 (3d Cir. 2007) ("When there is no direct evidence, courts use a *McDonnell Douglas-Burdine* type of burden shifting scheme to determine whether the plaintiffs have proved their case"); <u>Makenta</u>, 88 Fed. Appx. at 504.

### (i)   *Prima Facie* Case

Plaintiffs must first establish a *prima facie* case by demonstrating (1) prohibited conduct by the employer, (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may have become entitled under ERISA. <u>Gavalik v. Cont'l Can Co.</u>, 812 F.2d 834, 852 (3d Cir. 1987). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged conduct. <u>Jakimas</u>, 485 F.3d at 785. "If the employer carries its burden, the plaintiff then must persuade the court by a preponderance of the evidence that the employer's legitimate reason is pretextual." <u>Makenta</u>, 88 Fed. Appx. at 504. "To do this, [Plaintiffs] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." <u>Kowalski v. L & F Prods.</u>, 82 F.3d 1283, 1289 (3d Cir. 1996) (internal citations omitted). "Proof that the termination prevented the employee from accruing additional benefits through more years of service alone is not probative of intent." <u>Jakimas</u>, 485 F.3d at 785.

Plaintiffs do not offer any direct evidence that Defendant specifically intended to interfere with their attainment of ERISA benefits. Instead, they argue that the terminations were

pretextual because Defendant wished to downsize its operations and cut costs, and succeeded in saving money by depriving Plaintiffs of certain benefits. They further argue that a number of Plaintiffs were either ill or had spouses who were ill, and that Defendant was motivated by a desire to avoid healthcare costs. See Pls.' Resp. at 7. Plaintiffs' claims, however, do not withstand scrutiny. They have not presented any competent evidence that the T&E audit resulted in any notable downsizing at CertainTeed.[4] Moreover, there is no evidence in the record to support Plaintiffs' allegation that they were targeted for termination because of their health condition or benefits eligibility.[5]

Plaintiffs further dispute Defendant's representation that they repeatedly violated company policy, arguing that many of the expenses that were identified as "red flags," such as visits to Gentlemen's clubs, were widely-tolerated at CertainTeed and were pre-approved by direct supervisors. See Pls.' Resp. at 24-27. The critical inquiry, however, is not whether each red flag constituted an actual violation of company policy, but rather, whether Defendant had a good faith belief that Plaintiffs had engaged in inappropriate conduct. See Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."); see also Fucci v. Graduate Hosp., 969, F.

_____

[4] Defendant has submitted evidence revealing that all of the ten employees who were terminated as a result of the audit were replaced. See Carreras Aff. ¶7.

[5] The only Plaintiff who testified that he was ill during his tenure at CertainTeed was Douglas Ford. See id. at 35. Plaintiffs allege, without any evidentiary support, that "Mann's wife suffered from a very serious medical condition." Pls. Resp. at 31-32.

7

Supp. 310, 317-319 (E.D. Pa. 1997) ("the issue is not whether [the employer] conducted an investigation worthy of the FBI or reached a correct conclusion ... [the employer] quite reasonably could have concluded that plaintiff had engaged in inappropriate loan transactions with subordinates."); Cobetto v. Wyeth Pharms., 2007 WL 3034452, at *13 (W.D. Pa. Oct. 15, 2007); Section III(A)(iii), *infra*.

Plaintiffs also allege that they would have become vested in the retirement healthcare benefit "within a short period of time." Pls.' Resp. at 7. That argument, however, is unsupported by the record. Plaintiff Mann was ineligible for retiree medical benefits "because those benefits were not available to employees who, like Mr. Mann, came to CertainTeed when it acquired GS Roofing Products Group." Carreras Aff. ¶ 6. Plaintiffs Parker, Ward, Ford, and Wilson were years away from vesting in their retiree healthcare benefits.[6] See Plaintiffs' Ex. 52. Plaintiffs have not offered a sufficient nexus – temporal or other – between their terminations and any alleged cost-saving by Defendant to support an inference of specific intent to interfere with ERISA benefits. See Hendricks v. Edgewater Steel Co., 898 F.2d 385, 390 (3d Cir. 1990) (holding that the termination of a plaintiff 11 months prior to vesting of pension benefit was insufficient to establish specific intent); Zarrilli v. John Hancock Life Ins. Co., 231 Fed. Appx. 122, 124 (3d Cir. 2007); Lerner v. Gen. Elec. Co., 1995 WL 580041, at *3 (E.D. Pa. Sept. 29, 1995) ("[T]he time connection of 14 months, by itself, is not sufficient to create an inference of discriminatory intent.").

---

[6]    At the time of termination, Parker was 9 years away from vesting, Ward was 4 years away from vesting, Ford was 3 years away from vesting, and Wilson was 17 months away from vesting. See Plaintiffs' Ex. 52.

8

Plaintiffs complain that the interviews were conducted in a hostile and unprofessional manner because they were "interrogated for more than four hours" and threatened with both criminal and civil prosecution. Pls.' Resp. at 7.  However, Plaintiffs' characterization of the interview process, even if accurate, would not establish that the terminations were pretextual. Defendant has presented uncontroverted evidence that the audit was performed by Johnson, an independent contractor, at the request of Saint Gobain's general counsel, not CertainTeed management.  Wilk Dep. at 117.   Without any input or direction from CertainTeed, Johnson began the audits by scanning all employees' Travel and Entertainment files, and identified employees whose expense reports raised "red flags."  Johnson Dep. at 22-24; Wilk Dep. at 51-56. Plaintiffs in this case were all identified by Johnson and Wilk as having repeatedly violated company policy by submitting false or improper expense reports.  When interviewed, they were unable to explain their allegedly improper billing practices, and were subsequently terminated.[7] The two individuals who were charged with making the final decision regarding termination – William Burke for the Roofing Products Group, and Jorma Toivonen for the Insulation Group – testified without contradiction that at the time of the terminations they had no information about Plaintiffs' age, length of employment at CertainTeed, health condition, or eligibility for benefits. See Toivonen Dep. at 91; Burke Dep. at 46-47.

Plaintiffs do not dispute Defendant's description of the expense report audit as "blind to all benefits-related information."  Defendant's Reply Memorandum ("Reply Memo"), at 4. Johnson was never instructed as to which employee's files were to be audited.  He was not

---

[7]    Plaintiffs acknowledge that repeated violations of company policy constitute a legitimate reason for terminating an employee.  See Nov. 16, 2007 Hearing Transcript, at 68.

familiar with individual employees or their eligibility for benefits, and did not examine their personnel files when completing the audit:

> When I go into these audits, I usually don't know any of these people ... I don't know if they are good performers, bad performers, top performers. I don't know how old they are, I don't know what color they are. Sometimes I don't even know what sex they are, depending upon what their names are; and I don't care. I'm looking strictly at the documents. Management has no involvement in my selection process, my culling out process, my data base building, my red-flagging process. Management doesn't become involved until really the end of the process. They don't choose who gets interviewed and who does not get interviewed.

Johnson Dep. at 144.  Plaintiffs have presented no evidence suggesting that Defendant was in any way involved in the initiation or direction of the audit process that resulted in the terminations. Because it is undisputed that Plaintiffs were terminated pursuant to a blind audit and there is no competent evidence that Defendant specifically intended to avoid payment of ERISA-protected benefits, Plaintiffs have not established a *prima facie* case.  See Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 835 (E.D. Pa. 2005).

## (ii)   Legitimate Reasons for Terminations

Assuming *arguendo* that Plaintiffs have established a *prima facie* case, their claim fails under the *McDonnell Douglas-Burdine* burden-shifting analysis because Defendant has demonstrated a legitimate reason for the terminations.

## 1. John Ducaji

Wilk and Johnson interviewed Ducaji on October 30, 2003 after observing a large number of red flags in his T&E file. Ducaji brought documents to the interview with him, but refused to let Wilk and Johnson see them.  See Deposition of John Ducaji ("Ducaji Dep.") at 330

("Q: Why did you not let them look at those materials? A: It was my information."). Ducaji's behavior during the interview was uncooperative. <u>See</u> Wilk Dep. at 170-71; Johnson Dep. at 74-75. At one point he began whistling while looking at the documents he brought with him. Ducaji Dep. at 247 ("I can recall whistling. I was pretty laid back and low key about it. Which they don't appreciate – they didn't appreciate my whistling as well.").

In the course of his October 30, 2003 interview, Ducaji was questioned about a category of red flags related to visits to gentlemen's clubs, which were prohibited by company policy. During Ducaji's first visit to the club, he was accompanied by his direct supervisor, Bob Storey. Although Storey instructed Ducaji to submit the expense report, he did not instruct him how to report the expense. Ducaji falsely reported the expense as a dinner and the business purpose as "business planning." <u>See</u> Ducaji Dep. Ex. 28. He again visited a gentlemen's club, this time with a prospective customer, and again falsely reported the expense as a "dinner" and failed to name the establishment. Ducaji Dep. Ex. 29. Ducaji argues that because his supervisor had been present during the first visit to the gentlemen's club, his expenses were authorized. <u>See</u> Ducaji Dep. at 73-75. However, the Code of Ethics and Business Conduct Statement which Ducaji signed expressly states that "[n]o supervisor has the authority to require or permit conduct that is in violation of the Code or any law." Ducaji Dep. Ex. 11. In addition, the T&E Policy, which Ducaji acknowledged receiving, expressly provides that expenses incurred for "adult entertainment" or at "gentlemen's or women's clubs" will not be reimbursed. Ducaji Dep. Ex. 16, § 10.3. After the interview was completed, Wilk and Johnson reported the results to Toivonen, who made the final termination decision. Because Ducaji had no legitimate explanation for the clear violations of company policy and his attempts to conceal them, his

employment was terminated.[8]

## 2. Michael Mann

In contrast to the other Plaintiffs, who were members of the Insulation Group, Mann was a member of the Roofing Products Group, and was terminated as a result of a separate expense report audit. During his June 10, 2002 interview with Wilk and Johnson, Mann was questioned about a series of red flags, including multiple mutilated receipts obscuring critical information, unusually high weekend expenses, and inaccurate reporting of dates. Burke considered eight instances to be indicative of a pattern, and Mann had no explanation for these mutilations. See Burke Dep. at 44, 61-62 ("[W]hat I recall, it was more the pattern of the stubs, the times and dates and mutilations and changes on the stubs along with other items like this that created a pattern of frequency and severity."). On one occasion, Mann requested reimbursement for a "plant tour," when in fact the event was a retirement party attended by employees and their spouses. Id. at 42-44. Mann claimed that his supervisor had instructed him to submit the reimbursement request, but admitted that he should not have complied. Mann Dep. at 133 ("Like I said, I knew of one thing that wasn't right and I knew in my heart of hearts when I sat there, if I was questioned on it, I'd tell the truth. I did and the interview stopped, that was it, we're done.").

After the interview with Wilk and Johnson, Mann met with Burke. Burke decided to terminate Mann's employment after concluding that he had repeatedly violated company policy

---

[8]     "A plaintiff with a cognizable § 510 claim must allege that under an existing plan, he had a right to benefits which his premature discharge (whether constructive or direct) prevented him from realizing." Embrico, 404 F. Supp. 2d at 835-36. At the time of his termination, Ducaji was twenty-eight years old and had been employed by Defendant for four years. Ducaji was decades away from retirement age, and therefore Plaintiffs' allegation that Ducaji was terminated as part of a plan to avoid payment of ERISA benefits is manifestly unpersuasive.

12

and was unable to offer satisfactory explanations for the red flags found in his files.[9]  See Mann

Dep. at 144-45; Burke Dep. at 126-28.

### 3. Richard Parker

Parker was interviewed by Wilk and Johnson on November 3, 2002 after the audit of his

expense reports revealed numerous irregularities and a number of significant expenses that did

not have an apparent business purpose.  Parker began the interview by informing Wilk and

Johnson that he would like the interview to be cut short: "I looked at what they were looking for,

what were gray areas in the organization but were red flags in the term we have used here and

they used there, I took a different approach and I said I would like to – I know why we are here

and I'd like to make this as simple as possible."  Deposition of Richard Parker ("Parker Dep.") at

138.  In the course of the interview, Parker admitted to: 1) charging CertainTeed $700 for a

computer his family used although the company had given him a laptop for his use at home and

while traveling, id. at 152-54; 2) seeking reimbursement for a Waterford crystal souvenir

purchased for himself, id. at 147-48; 3) failing to reimburse Defendant for a plane ticket to

Ireland he had purchased but never used, id. at 142-43, 145-46; 4) seeking reimbursement for two

hotel rooms in Tennessee when there was no business purpose for the second room, id. at 241-

43; and 5) guessing at expenses and submitting cash stubs to make up for funds for which he was

unable to account.  Id. at 143-44.  Because Parker asked to terminate the interview before it was

completed, there were multiple red flags left unexplained.  See Toivonen Dep. at 226-27;

---

[9]     Defendant has provided uncontested evidence that a number of other employees who
were interviewed as part of the Roofing Products Group audit were retained although they were older
than Mann and had more valuable benefits.  See Carreras Aff. at ¶ 6; see also Nov. 16, 2007 Hearing
Transcript, at 76.

Toivonen Dep. Ex. 2.

Toivonen stated that during his meeting with Parker following the interview, he gave Parker another opportunity to explain the red flags, but Parker was unable to provide explanations, and asked that the interview be cut short.  See Toivonen Dep. at 72-73, 226-27. Toivonen further testified that Parker admitted his wrongdoing.  Id.  ("[H]e told me that he has done wrong.  I'm sorry about it, Jorma.  I've done wrong.").  Parker argues that he never admitted to any violations of company policy; he merely stated that the expense reports he was asked about during the interview were "gray areas" he knew to be common practice and acceptable in the business.  See Parker Dep. at 138, 140-41.

**4. Kenneth Wilson**

Wilk and Johnson interviewed Wilson on October 29, 2003, after Johnson's quick scan resulted in numerous red flags.  These red flags included: 1) eighty-eight submissions of homemade cash receipts in lieu of the original credit card receipts, see Toivonen Dep. Ex. 1; 2) multiple instances where the date or time on a receipt submitted by Wilson did not match the date or time on the expense report, see Deposition of Kenneth Wilson ("Wilson Dep.") at 279-80; 3) five instances of improper claims for packaged liquor or beer, id. at 342-44 ; 4) four spa trips, see id. at 325-31, 333-35; 5) $140 for tinting his car windows, id. at 346; and 6) lodging for hotels within thirty and forty miles of his home.  See id. at 285-86, 345-46.  Wilson could not provide satisfactory business reasons for many of the red flags, and explained most of the discrepancies or irregularities as mistakes.  See id. at 279-80, 285-87, 344-45.

After the interview, Wilson met with Toivonen, who gave him another opportunity to

explain the red flags. <u>See</u> Toivonen Dep. at 63. Toivonen testified that Wilson was unable to provide satisfactory explanations, and based on the severity and frequency of the irregularities, he decided to terminate Wilson's employment. <u>See</u> <u>id.</u> at 47-48, 53-54, 65-67.

## 5. Douglas Ford

Wilk and Johnson interviewed Ford on November 5, 2003 because of hundreds of red flags found during the audit. These unresolved red flags included unusually high expenses for weekend entertainment, numerous submissions of mutilated receipts where important information was obscured, over eighty instances of dining expenses near Ford's home, and a false entry involving a meal at Chili's restaurant on July 10, 2001. <u>See</u> Deposition of John Ford ("Ford Dep.") Ex. 24. Ford admitted that he had intentionally falsified the entry for dinner at Chili's restaurant by reporting that he had dinner with one customer, when in truth he had dinner with another customer, but explained that his supervisor had instructed him to falsify the report. <u>See</u> Ford Dep. at 91-92, 225-26. Ford also admitted to having torn off a portion of a receipt to avoid revealing that he purchased cigarettes and cigars for customers, but again stated that he was instructed to do so by his supervisor. <u>See</u> <u>id.</u> at 63-64, 251. When confronted, Ford asked to terminate the interview, stating "I broke the rules ... there's no sense continuing this on any further." <u>Id.</u> at 96.

During the follow-up meeting with Toivonen, Ford was given another opportunity to explain the red flags, but repeated his previous explanation that the expenses were approved by his supervisor and were tolerated in the company. <u>See</u> Ford Dep. at 235-37. Toivonen then terminated Ford's employment based on the frequency of the violations and the number of red

flags left unexplained.  Toivonen Dep. at 81-88; Ford Dep. at 236 ("[Toivonen] said, I don't know what to do ... I'm very sad to have to let you go.  I really like you ... [but] there's still a violation of policy.").

**6.  John Ward**

John Ward was interviewed by Wilk and Johnson on November 3, 2003 because of numerous red flags found in his T&E file.  The most significant red flags related to duplicate submissions of expense reports for hunting trips Ward took with customers.  See Toivonen Dep. at 76-80, 264-65; Deposition of John Ward ("Ward Dep.") Exs. 40, 41.  In his expense report for January 2000, Ward sought reimbursement in the amount of $1739.16 for a hunting trip, plus two tips in the amounts of $50 each.  See Ward Dep. Ex. 41.  Months later, he submitted the identical invoice and was reimbursed again for $1739.16, but this time handwrote different tip amounts ($40 and $80) on the invoice copy.  Compare Ward Dep. Ex. 41 at C(JW) 483, with Ward Dep. Ex. 41 at C(JW) 530.  Ward admitted that he submitted a duplicate expense report.  See Ward Dep. at 306-09.  Ward submitted additional duplicate reports for hunting expenses: In a January 2002 expense report, he sought reimbursement for a $60 dollar tip he gave to a guide during a January 25, 2002 hunting trip.  In a February 2002 report, he sought reimbursement in the amount of $291.15 for the January 25, 2002 hunt, plus a $120 tip, for a total of $411.15.  In a March 2002 expense report, he submitted the identical January 25, 2002 invoice, handwrote that he had paid a $60 tip, and reported that the trip took place on March 23, 2002.  See id. at 309-15; Ward Dep. Ex. 42 at C(JW) 543; Ward Dep. Ex. 43 at C(JW) 631, Ward Dep. Ex. 44 at C(JW) 685, C(JW) 692.

16

Another significant category of red flags involved reimbursements for airline tickets. Ward repeatedly expensed the full price of the tickets although he had previously received reimbursements from the airline company, failing to credit CertainTeed for the refunds he received.  See Ward Dep. at 288-93, 297-99; Ward Dep. Ex. 37.   When confronted with these red flags, Ward stated that he made a mistake or misunderstood the way the credits were applied. Ward Dep. at 291-93.  Additionally, he admitted that he regularly paid for meals with cash instead of credit cards and then when filling out his expense report a month or two later, he filled in the stubs received from the restaurants based on estimated amounts.  Id. at 83-85.  Ward stated that the use of cash was tolerated at the company and had been approved by supervisors.  Id. at 83-84.  After the interview, Ward met with Toivonen, who decided to terminate Ward's employment based on the frequency and seriousness of Ward's violations and his inadequate explanations for them.  See Toivonen Dep. at 76-80 ("[M]y basic understanding was that he confessed that he had done all these things, so there was no reason to discuss it at length").

(iii)    **Pretext**

Because Defendant has articulated  legitimate reasons for the terminations, the burden shifts back to Plaintiffs, who must demonstrate by a preponderance of the evidence that the reasons proffered by Defendant are pretextual.  Makenta, 88 Fed. Appx. at 504; Kowalski, 82 F.3d at 1289.  Plaintiffs have failed to meet this burden.  See Jakimas, 485 F.3d at 788 ("Nothing in the record proves by a preponderance of the evidence that the Appellees' reasons are not credible, nor that the intention to interfere with pension benefits was more likely what motivated the decision ...").  Each Plaintiff was found to have violated the Defendant's T&E policy by submitting false or improper expense reports.  While Plaintiffs argue that the expenses were

17

either approved by supervisors or widely-tolerated practices, the critical inquiry is not whether each red flag constituted an actual violation of company policy, but rather, whether Defendant had a good faith belief that Plaintiffs violated policy. See Fuentes, 32 F.3d at 765; see also Scully v. Allegheny Ludlum Corp., 2007 WL 4294729, at *2 (3d Cir. Dec. 10, 2007); Fucci, 969 F. Supp. at 317-319; Cobetto, 2007 WL 3034452, at *13. There is no competent evidence in the record to suggest that Defendant's proffered reasons for the terminations are unworthy of credence.

Plaintiffs allege that two other CertainTeed employees, Michael Clements and Joseph Quigley, were found to have significant red flags but were not terminated. See Pls.' Resp. at 6. Plaintiffs attribute CertainTeed's retention of these employees to the fact that "both men were responsible for servicing the Insulation Group's largest customer MASCO." Id. They allege that after learning about the audit, MASCO's president contacted CertainTeed to ensure that Clements and Quigley would not be terminated, and indeed, these two employees were retained. See id.[10] Plaintiffs' argument, though offered as evidence of pretext, does not support the claim.

---

[10]     MR. RYAN:      So Quigley has seven pages of red flags ... and he doesn't get fired. And guess why? Because this hatchet job is going on, the word gets out, the customer calls. MASCO, one of the big customers, president of MASCO picks up the phone and calls CertainTeed and says "You know, you – you folks are brutalizing my – my salesman. You know, knock it off or you're gonna lose – lose business." So Quigley gets – gets to skate ... Again, a fellow by the name of Michael Clements ... he has ... seven pages of questionable items, totaling $16,578 ... Does anything happen to him? No. Mr. Masco calls and says, "Don't do anything to him. [...]

THE COURT:      Well, they didn't get fired because a major customer said they didn't want them fired.

MR. RYAN:      Correct. [...]

Nov. 16 Hearing Transcript at 26-28.

Plaintiffs do not offer any evidence regarding Quigley and Clements' age, health condition, or eligibility for benefits, and therefore there can be no inference that they were similarly situated. Moreover, the notion that Defendant determined not to terminate an employee so as not to anger a major customer fails to support the theory that Plaintiffs' terminations were pretextual. Because Plaintiffs have failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Defendant's proffered reasons for the terminations, and because there is no competent evidence in the record that would raise a genuine issue of material fact as to whether Defendant's reasons were pretextual, summary judgment will be granted in Defendant's favor.  See Fucci, 969 F. Supp. at 319; Makenta, 88 Fed. Appx. at 506.

## B.   The Breach of Contract Claim

Plaintiffs have withdrawn their claims under the Pennsylvania Wage Payment and Collection Law ("WPCL"), and therefore, the only remaining claim is breach of contract.  In order to prove a breach of contract claim, a plaintiff must establish the following elements: "(1) the existence of a valid and binding contract to which the plaintiff and defendants were parties; (2) the contract's essential terms; (3) that plaintiff complied with the contract's terms; (4) that the defendant breached a duty imposed by the contract; and (5) damages resulting from the breach." Regent Nat'l Bank v. Dealers Choice Automotive Planning, Inc., 1999 WL 357364, at *4 (E.D. Pa. June 2, 1999).

Plaintiffs' sole argument in support of the breach of contract claim is that their termination was pretextual and therefore not "for cause." Pls.' Resp. at 45.  While alleging that Defendant misrepresents the true motivation for the terminations, they have cited no legal authority, either in their responsive brief or during oral argument, for the theory that pretext is a

19

viable basis for a breach of contract claim.  Plaintiffs were terminated as a result of violations of CertainTeed's T&E Policy and Code of Ethics.  They have not produced any competent evidence that either the auditors or the individuals charged with terminating Plaintiffs had any information regarding Plaintiffs' age, length of service, or eligibility for benefits.  As Plaintiffs acknowledge, repeated violations of company policy constitute justifiable cause for termination.  <u>See</u> Nov. 16, 2007 Hearing Transcript, at 68.  According to the express terms of CertainTeed's benefits policy, employees terminated for cause are ineligible to receive incentive and/or annual bonus payments.  <u>See</u> Extended Pay and Benefits Policy ¶ 5.1 ("The following Extended Pay and Benefit Programs may be extended to employees as of the last day worked who are separated for reasons other than Termination for Misconduct, Resignation or Furlough."); <u>see also</u> Performance Incentive Program, Ducaji Dep. Ex. 5, at 3 ("Territory Managers who resign or who are terminated for lack of performance or justifiable cause will not receive any unpaid incentive awards under this plan, regardless of the date the individual leaves the company.").  Because Plaintiffs have failed to demonstrate that Defendant breached the terms of the Performance Incentive Program or any other benefits plan, this claim will be dismissed.

## IV.   CONCLUSION

For the aforementioned reasons, Defendant's Motions for Summary Judgment will be granted as to all of Plaintiffs' claims.  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN BALMAT, <u>et al.</u>                    :        CIVIL ACTION
                                              :
          v.                                  :
                                              :        NO.  04-2505
CERTAINTEED CORPORATION                       :
                                              :

## ORDER

AND NOW, this 2-8th day of December, 2007, upon consideration of Defendant CertainTeed Corporation's Motions for Summary Judgment (docket nos. 42-47) and all responses thereto, after an oral argument, and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the Motions are **GRANTED** and the Clerk of the Court shall mark this case **CLOSED**.

BY THE COURT:

BRUCE W. KAUFFMAN, J.